# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00028-CV

---

**N. K., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 453RD DISTRICT COURT OF HAYS COUNTY**
**NO. 20-1373, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant N.K. (Father) challenges a district court's order terminating his rights to two children, "Brandy" and "Andrea,"[1] respectively aged six and four at the time of trial. The trial court also terminated Mother's parental rights, but she did not appeal. Father first argues that the evidence presented to the trial court is legally and factually insufficient to support the sole predicate ground for termination—that he had "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(E). Second, he argues that the evidence is legally and factually insufficient to support the district court's finding that termination is in the best interest of the children. *See id*. § 161.001(b)(2). We affirm.

---

[1] *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. A third daughter was born during the pendency of this case and is the subject of separate proceedings.

## BACKGROUND[2]

The Department opened the investigation that led to this termination in June of 2020 upon receiving reports that Mother and Mother's live-in boyfriend were using illegal substances, possibly in the presence of the children. Father was in the custody of the Texas Department of Criminal Justice at the time on charges of aggravated assault with a deadly weapon. According to the affidavit supporting the petition for services, investigator Arlene Castro visited Brandy and Andrea at home with their maternal grandmother and great-grandmother, who reported that Mother had been gone for three days. Mother's boyfriend arrived at the home during the visit but refused an interview, and the grandmother and great-grandmother "interfered with" Castro's attempts to interview the children.

According to the affidavit, Castro visited again the next day to find Mother and "a friend," with the two of them reporting that they had returned from spending several days traveling together. Mother and the friend apparently offered various aliases for the friend, but the Department ultimately identified him as Brandon, an individual with "an extensive criminal history spanning multiple counties," "includ[ing] multiple narcotic charges, engaging in organized criminal activity and assault charges." Mother and Brandon both admitted to recent marijuana use. Brandon refused testing; Mother agreed to testing of urine samples but not hair samples. Mother's samples returned "negative but dilute."

The Department's research revealed Mother's and Father's history with the Department. The Department received reports regarding Mother in 2016 and 2019, with both reports involving allegations of drug use, one involving neglectful supervision, and one including possible domestic violence. The Department received reports regarding Father in 2010, 2016,

---

[2] This section is taken from undisputed aspects of the record.

and 2019.  In 2010, the Department investigated reports that Father, at thirteen years old, had sexually assaulted a three-year-old family member.  After finding "reason to believe" the allegations, the Department turned the matter over to law enforcement.  The 2016 investigation included reports that Father would allow Mother to engage in substance abuse in front of the children.  The 2019 report resulted in "reason to believe" the children were suffering neglectful supervision.

The Department's research also revealed criminal history on the part of both Mother and Father.  Mother had been arrested on two non-violent offenses.  One (resisting arrest) was never prosecuted; the other (credit card fraud—elderly) was still pending at the time of trial.  Father has a more extensive criminal history, with multiple charges for violent offenses, including the aggravated assault with a deadly weapon charge for which he was incarcerated during the pendency of this case.

### TRIAL[3]

The parties tried the case to the bench over two days in September and December of 2021,[4] remotely in accordance with the emergency orders in place at the time.  *See Thirty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 897, 897 (Tex. 2021) (order); *Thirty-Seventh Emergency Order Regarding COVID-19 State of Disaster*,

---

[3]  Although Mother did not appeal termination, we describe much of the testimony regarding her, as it bears on the outcome of the issues raised by Father's appeal.

[4]  The unusual timeline of the case, which remained pending for nearly two years, is presumably a result of the ongoing pandemic.  *cf*. Tex. Fam. Code § 263.401(a) (requiring trials in such cases to commence on or before the first Monday following the anniversary of the first filing of temporary orders).  The Department's motion for an extension, which the trial court granted, referred only to "extraordinary circumstances" that necessitated extending the statutory deadline from January 25, 2021, to July 24, 2021.  *See id*. § (b).

629 S.W.3d 186, 186 (Tex. 2021) (order); *Thirty-Eighth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 900, 900 (Tex. 2021) (order); *Thirty-Ninth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 213, 213 (Tex. 2021) (order).

Deputy Matthew Vasquez of the Victoria County Sheriff's Office testified first. He explained that he is assigned to the "Gulf Coast Violent Offender and Fugitive Task Force," which "go[es] after wanted fugitives" and "includes drug interdiction." He testified that on August 31, 2020, he and his partner had been assigned "to search for . . . a black Kia Sorento" with a specified license plate. Vasquez had received information that Brandon was selling narcotics out of that vehicle and was advertising as much on social media. Vasquez testified that, upon approaching the vehicle, the two deputies "detected a strong order . . . of marijuana emitting [sic] from the vehicle," and that "multiple officers" were called and responded to the scene. He further testified that a search recovered 14.2 ounces of marijuana and an unspecified number of hydrocodone tablets. Vasquez testified that the occupants of the vehicle were Brandon and Mother, both of whom "were charged for manufacture/delivery of a controlled substance in penalty group 3 or 4, less than 28 grams, as well as possession of marijuana, greater than 4 ounces but less or equal to 5 pounds." When asked if Brandon and Mother were the only occupants of the vehicle, he answered in the negative, explaining that "there was also a small female child," which he ultimately identified as "the daughter to [Mother]." Vasquez estimated that the child was a "toddler" and "approximately two years of age."[5] Finally, Vasquez testified that he was "not familiar" with Father, who was not present at the scene.

---

[5] Vasquez did not specify which of Mother's daughters was in the vehicle, but the estimated age supports a reasonable inference that it was likely Andrea.

Sergeant Jason Boyd of the criminal-interdiction unit of the Victoria County Sherrff's Office offered testimony similar to Deputy Vasquez's. He testified that on July 22, 2021, the county's narcotics investigators had "directed [his] attention to a vehicle that [Mother had] occupied" because "one of [the] investigators detected the smell of marijuana emanating from the vehicle." Boyd explained that he responded and approached the vehicle and "actually observed marijuana in plain view," ultimately finding two bags of an unspecified amount of the substance. He testified that Brandon and Mother were in the vehicle, that backup officers responded, but that he (i.e., Boyd) remained at the scene "the entire time." The Department then tendered, and the court admitted, eight photos that Boyd confirmed accurately reflected the scene as he found it, including the presence of marijuana, a scale, an unspecified sum of currency, and a child in a car seat. Boyd testified that in his experience, the scene was not safe for a child. In addition to exposure to the possession and trafficking of drugs, and the potential exposure to other crimes often associated with drug use, he said, "[T]here was also the—the time of night, the lack of food . . . no diapers, no childcare products except for that one bottle [referring to photo] that was on the backseat." When asked about Father, Boyd testified that he was "not familiar with the name."

Department investigator Arlene Castro testified next, largely to the effect of the affidavits she had filed in support of the Department's petitions. Although there is no evidence that Father was ever notified of this information, Castro recalled a report that Mother and her live-in boyfriend "were giving each other shots in the arm" and described her initial visits to Mother's home in June of 2020. Castro recalled that Mother claimed she "didn't really know" Brandon, describing him as "just like, some dude she knew through, like a third party." Castro, however, testified that Brandon appeared "very comfortable at that residence" and that Brandon

5

was listed as "boyfriend" at intake. Upon conducting background checks, Castro found that Mother "had a pending theft charge out of Hays County" and that Brandon had "substantial criminal history with regards to drug[-]related charges out of both Hays County and Victoria County."

Castro then summarized Mother's compliance with the service plan. She testified that on September fourth, Mother and Andrea both tested positive for marijuana via hair-follicle testing. At that point Castro concluded that the children were in a "dangerous" situation, that they were not old enough to protect themselves, and that removal and the naming of the Department as temporary managing conservator was in the best interest of the children. She recalled that the Department placed her on a service program but did not seek a court-ordered family service plan at that time. She testified that, although Mother had completed her services, she "didn't learn from her services," testing positive for marijuana around three months later.

With respect to Father, Castro testified that she had not been able to meet with him because of his incarceration and "because of COVID." She said she had spoken to him once on the phone but did not describe that conversation other than to say that she had "advised him of the report." She agreed with the statement that Father "was not involved in the occurrences that brought this case to light."

Paternal Grandmother took the stand next and described herself as "an active grandmother in [Andrea's and Brandy's] lives since they were born. She testified:

> I had several concerns with the girls' safety and hygiene issues towards the end of—you know, towards the beginning of the CPS case. You know, there's always been active drug use. . . . [Andrea] spent a lot of times with us. We initially— before the CPS case, she had gone to the doctor. They had—both girls had lice. [Andrea] has also had—they had scabies at one point. They were—in Victoria,

6

from what—you know, when we—when they got the lice and the scabies were in Victoria, I guess living in hotel rooms.

Grandmother also testified that her son expressed "disappointment and stuff" "[m]ainly towards himself because he was incarcerated and wasn't able to help the children." She recalled that Father "did not know about these [health and safety] concerns when he was incarcerated," but that he "expressed concerns" once he learned of the circumstances. She testified that Father, once released—and assuming he retained his parental rights—would still be able to experience most of the—the girls' childhood. She testified that, while incarcerated, Father has received therapy for anger management, taken parenting classes, completed his GED, and attends Bible Study. She testified that the girls "love" their father, interact well with him, and would be "safe" in a family placement with Father retaining parental rights.

Caseworker Selena Shabani testified that she took over the case after the Department was awarded temporary managing conservatorship. She explained that Mother's service plan included:

> [t]hat [she] maintain safe and stable housing, that she be employed, that she not engage in criminal activity or those that engage—or with those that engage in criminal activity, that she complete an OSAR, Protective Parenting, psychological [assessment], follow any of those recommendations, engage in individual therapy. . . . also psychosocial [assessment] and that—the final one was that if she chose to remain in a relationship with Brandon, that he would also engage in the services that—that she would do.

Shabani testified that she could not "verify" compliance with the plan, explaining that she could not confirm Mother's employment, if any; could not confirm Mother's housing, if any; could not confirm whether Mother was living with anyone else; and could not determine whether Mother was sober and clean at the time of trial. She conceded that Mother had submitted to some of the

drug testing and had completed a psychological assessment, and that visitations with Mother were "pretty good." She testified that Father would remain incarcerated through late 2023 and that the provision of services was difficult due to the incarceration but that he had made a "good-faith" effort to complete those services. She also said that the long absence from the children would have prevented them from "bonding" to him. She noted that he had sent letters to the children. Shabini testified that her concerns for the safety of the children had not been alleviated by Mother's and Father's progress due to "ongoing issues with drugs and . . . criminal activity." She further testified that termination was in the best interest of the children because it would allow permanence for the children.

Father's brother (Uncle) testified as the head of the household where the children were placed for the nine months preceding trial. He complained that "they were always dirty" and "smelled like marijuana," and that Andrea had lice and impetigo. He also testified that the children's health and safety is his "number one priority." When asked about the girls' progress in his care, he testified that the children have gained weight, are winning academic awards, and are taking dance lessons. Uncle summarized the overall state of the children as "doing very well" and indicated that he and his wife hope to adopt the girls, which he believed was in the girls' best interest. He explained that he was just "trying to give them the best life; give them the life they don't have." He continued, "So, I'm just trying to break the cycle and let them be kids and let them not have to worry about where they're going to sleep or who they're going to stay with or who's going to watch them." He testified that Father sent letters to the girls "once or twice a month," but that—in contrast to Shabani's testimony—the girls did not like visitation with Mother, and that visitation is "not beneficial."

Father testified that he had been incarcerated since 2017, before the inception of this case. When he learned of the conditions the children were living in, he described himself as "hurt and a little bit shocked" because he "just wanted [the] children to be in good hands." He said that if he had been home and not incarcerated "the situation at hand would be different" and that he "blame[s] [him]self" for the conditions the children were living in. He described his participation in Alcoholics Anonymous, an anger-management class, and a Bible study. He indicated that he had completed his GED and hoped to learn a trade so that he might have "stable finances and housing" on release. He argued that his criminal activity did not affect the children because they were not with him when any of that activity took place. When asked about his relationship with the children, he responded that they "regularly talk" and that "there is love there and there is a bond there."

Elizabeth Peña, a CASA supervisor, testified last. She briefly testified that "CASA supports the Department's plan for termination in order for the children to obtain permanency." She explained that, in her opinion, "neither parent are [sic] in a position to have the children returned to their care at this time" and that "the children deserve to have permanency."

Exhibits admitted at trial include the results of the drug tests, the temporary order naming the Department managing conservator of the children, the family service plans for Mother and Father, a status report, and photographs depicting the scene the night of August 31, 2021, when Mother and Brandon were apprehended in possession of multiple illegal substances, a scale, and a large sum of money. The presiding judge announced his decision from the bench, finding that both Mother and Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional

well-being of the children, *see* Tex. Fam. Code § 161.001(b)(1)(E), and that termination is in the children's best interest, *see id*. § 161.001(b)(2).

**STANDARD OF REVIEW**

The trial court may order termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental[-]rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that

relationship" in absence of "evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007 and *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

## DISCUSSION

On appeal, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that the Department satisfied its burden under statutory predicate (E) and its finding that the Department satisfied its burden to demonstrate that termination is in the children's best interest. Although Father raises both legal- and factual-sufficiency

11

challenges, we will only address the latter, as evidence that is factually sufficient to support a holding is necessarily legally sufficient to support that holding.[6]

### Statutory Predicate: Endangerment

The Department satisfies its burden under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). Endangerment is exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Fam. & Protective Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698–99. A finding of endangerment requires more than the threat of metaphysical injury or ill effects from a less-than-ideal family environment, but the Department need not prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. "Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct." *A.C.*, 577 S.W.3d at 699. Evidence of domestic violence is relevant to endangerment, even if the violence is not directed at the child. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524

---

[6] Evidence that is factually sufficient to support a finding is necessarily legally sufficient to do so:  in conducting legal-sufficiency analysis, the reviewing court employs a standard more favorable to the disputed finding and examines a subset of the evidence that is less likely to controvert that finding. *See, e.g.*, *K.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00116-CV, 2020 WL 4462320, at *4 (Tex. App.—Austin July 15, 2020, pet. denied) (mem. op.) ("Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard."); *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.) ("If the evidence is factually sufficient, then it is necessarily legally sufficient as well."); *In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.) ("[B]ecause the evidence is factually sufficient, it is necessarily legally sufficient." (citing *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.))).

(Tex. App.—Austin 2019, no pet.); *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.). When evaluating a finding under subsection (E), a court may consider conduct occurring "both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

Father argues that he could not have "knowingly" subjected the children to dangerous conditions because of his incarceration and concomitant limited awareness of the children's well-being. In other words, he contends he had no way of knowing what would transpire in Mother's household or to address any concerns once he learned of them. We find the argument unpersuasive. First, the undisputed record reveals that Father has led a recidivist lifestyle that includes crimes of violence. A life of violence—even where that violence is not directed toward the child or children subject to the suit—is evidence that the children may be exposed to dangerous conditions. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th] 2003, no pet.) (explaining that "want of self control" and "propensity [toward] violence" constitute evidence of endangerment); *see also L.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00793-CV, 2015 WL 3654631, at *2 (Tex. App.—Austin June 8, 2015, pet. denied) (mem. op.) (emphasizing that violent acts need not be directed at child). Moreover, Mother told the Department that she had no financial problems until Father was incarcerated, suggesting that Father had endangered the children by virtue of the very fact that put himself in a position to be taken into custody.

And with respect to Father's purported lack of knowledge of the conditions in Mother's household, satisfaction of subsection (E) does not require actual knowledge of any harm that befalls the child. Instead, the subsection requires only that the parent engage in a

13

course of conduct including acts or omissions that jeopardize the physical or emotional well-being of the child, *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied), and Father's criminal history and his own testimony provide evidence that Father engaged in such a course. And regardless, the record undermines Father's argument that he could not have contributed to the issues in the household or known that the children were endangered. Mother and Father were each subject to earlier Department investigations, with that history involving concerns of substance abuse in the household. In the present case, Father admitted to the Department that he has historically used marijuana and cocaine, and Father has a recent conviction for possession of marijuana. Thus, a factfinder could reasonably infer from this history that Father was likely aware of Mother's substance abuse and other risk factors when he committed the offenses that led to his incarceration and separation from the family. Accordingly, for all the foregoing reasons, we reject Father's challenge to the sufficiency of the evidence to support the finding of endangerment under subsection (E).

### B. Best Interest

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to [his] minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and

14

substantial reasons.'" *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [his] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

In evaluating best interest, we consider the factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), which include the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *See also A.C.*, 560 S.W.3d at 631; *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.—El Paso 2012, no pet.). It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive, and no one factor is necessarily dispositive of the question, but in some instances, evidence of a single factor may suffice to support the best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We begin with the children's wishes. Uncle testified that the children are too young to adequately express their wishes and "don't know exactly what's going on." There is little evidence in the record regarding any relationship between the children and Father or any

15

desire they might have to reunite with him, other than testimony that he sent letters while incarcerated and has visited with and is bonded to the children. Grandmother testified that Brandy is a "daddy's girl" and that Andrea "opens up" to Father, but she also testified that Father was incarcerated shortly after Andrea was born and when Brandy was approximately two. The trial court could have inferred that the long absence would render it less likely that the girls would want to maintain a relationship with a Father they have essentially never known. *cf. In re J.M.H.*, No. 04-14-00471-CV, 2014 WL 6687237, at *5 (Tex. App.—Austin Nov. 26, 2014, no pet.) (mem. op.) (examining evidence that six-year-old had no desire to "build a relationship" with father that had been incarcerated five years of child's life).

Turning to the children's emotional and physical needs and any emotional or physical risks to the children now and in the future, it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child. *See In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Rios v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00565-CV, 2012 WL 2989237, at *9 (Tex. App.—Austin July 11, 2012, no pet.) (mem. op.). Far from demonstrating a life of stability, Father has been in and out of the custody of the Department of Criminal Justice for years and for the majority of the children's lives, leaving them uncertain about any role he plays in their lives. He has engaged in violent activity and substance abuse, both of which jeopardize the well-being of a child. Uncle testified that the children need to "not have to worry about where they're going to sleep or who they're going to stay with or who's going to watch them." Shabani agreed, testifying that the children need to be "kept safe" and that neither Mother nor Father had demonstrated that they could provide that safety.

16

With respect to the parenting abilities of any parties seeking access to the children, Father testified that if he had been "at home" with the children—instead of incarcerated—things "would be different." Father did not elaborate on that hypothetical, but the rest of his testimony suggests a belief that he could have prevented or corrected Mother's substance abuse and the health and hygiene issues affecting the children. Nevertheless, the very fact that Father was absent due to incarceration is evidence of limited experience in the household and reflects negatively on any parenting ability. *See, e.g.*, *In re A.M.*, No. 02-16-00208-CV, 2016 WL 7046858, at *4 (Tex. App.—Fort Worth Dec. 2, 2016, no pet.) (mem. op.); *In re A.S.*, No. 06-16-00039-CV, 2016 WL 6081503, at *7 (Tex. App.—Texarkana Oct. 18, 2016, no pet.) (mem. op.); *In re R.R.*, No. 04-16-00268-CV, 2016 WL 4772347, at *5 (Tex. App.—San Antonio Sept. 14, 2016, no pet.) (mem. op.).

In contrast to Father's limited parenting experience, the children's current placement, Uncle and his wife, are managing a household of four children with no evidence of any problems. During a placement interview with the Department, they reported that they were "really excited" to have the opportunity to help Andrea and Brandy and are "committed to caring" for the girls as long as necessary. They indicated that they had already considered the financial and childcare changes required to support the expanded household and that they would give the girls time to adjust to new "rules and norms" but would only turn to "appropriate discipline" to correct any misbehavior. The couple said they were not aware of any behavioral issues or special needs affecting Andrea or Brandy, but that they would contact the Department should any such issue arise. According to Grandmother, the children are "thriving" in this placement, have improved academically, and are enjoying dance classes. Grandmother also testified that the children "feel safe" with Uncle and his wife.

17

When it comes to plans for the children, Shabani testified that the Department intends to leave the children placed with Uncle and his wife, who, assuming the court orders termination, may ultimately adopt them. Uncle testified that he agreed with that plan and hopes for adoption. Meanwhile, it is undisputed that Father has been incarcerated or otherwise absent for most of Brandy's and Andrea's lives. Father testified that he would earn an associate's degree or learn a trade while incarcerated and would establish a stable home and stable employment upon release. He conceded, however, that he had not begun any work on the associate's degree or toward a trade certificate. Moreover, even setting aside the evidence that the children would not benefit from Father's tentative plans for at least two years, self-serving testimony of such a "speculative" and "hypothetical" nature does not constitute evidence of a concrete plan for the children. *See, e.g.*, *In re A.P.S.*, No. 07-11-00476-CV, 2012 WL 1835688, at *7 (Tex. App.—Amarillo May 21, 2012, no pet.) (mem. op.); *Gonzalez v. Texas Dep't of Fam. & Protective Servs.*, No. 03-06-00004-CV, 2008 WL 2309208, at *6, *9 (Tex. App.—Austin June 5, 2008, no pet.) (mem. op.).

Finally, we consider any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. The undisputed evidence of Father's history of violence, criminal activity, drug use, and absenteeism are all indicators of an improper relationship. *See D.F. v. Texas Dep't of Fam. & Protective Servs.*, 393 S.W.3d 821, 836 (Tex. App.—El Paso 2012, no pet.). In what appears to be an excuse for past behavior, Father testified that sometimes people "make mistakes" and "snap" but that "[p]eople can change" and "better themselves." As evidence of his attempts to better himself, Father points to his completion of a GED and his participation in Alcoholics Anonymous, an anger management program, parenting classes, and Bible study. But even assuming these efforts have the positive results Father

18

anticipates upon his release in approximately two years, "evidence of improved conduct . . . does not conclusively negate the probative value of a long history of . . . irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

After reviewing the record, we conclude the evidence would allow a reasonable factfinder to come to a firm belief or conviction that termination is in the best interest of Andrea and Brandy. We therefore reject Father's evidentiary-sufficiency challenge to that finding.

## CONCLUSION

We have concluded that the record includes legally and factually sufficient evidence to support termination of Father's parental rights pursuant to Texas Family Code Section 161.001, subsections (b)(1)(E) and (b)(2). We therefore affirm the order of termination.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed.

Filed: July 12, 2022